Good morning, Your Honors, and may it please the Court, Nina Naruz-Khani appearing as pro bono counsel on behalf of Petitioner Mr. Rojas. I'd like to reserve three minutes for rebuttal. The Immigration Judge and the Board of Immigration Appeals' determination that Mr. Rojas' 2012 testimony was not credible, is not supported by substantial evidence, and should be reversed for two reasons. First, the Immigration Judge and the Board of Immigration Appeals failed to consider Mr. Rojas' reasonable explanation for the one material inconsistency that went to the heart of his claim, whether and to what extent he had committed acts of torture while serving in the Peruvian military. And second, the Immigration Judge and the Board of Immigration Appeals gave too much weight to perceived inconsistencies in Mr. Rojas' testimony that did not go to the heart of his Adjustment of Status claim. I'd like to address each of those in turn, and make a preliminary note for the Court. This is a pre-Real ID Act case, and so the standards of the Real ID Act do not apply. And for that reason, the Immigration Judge was bound to consider Mr. Rojas' reasonable explanation for any inconsistencies that go to the heart of his claim, and explain why the Immigration Judge believed those explanations were not credible. Any failure to do so meant that those inconsistencies are not credible. But he did consider, I mean, he did consider the explanation. It's in the decision. Well, Your Honor, the Immigration Judge did make a one-line reference to it on page 12 of the opinion, which is 101 of the record, but the legal standard in this Court is that a reference or pointing out an individual's explanation for an inconsistency is not sufficient. So what was he supposed to say? Well, what he was supposed to say was up to the Immigration Judge, but the Immigration Judge should have at least given a reasoned explanation for why Mr. Rojas' explanation for this key issue was not plausible, and the Immigration Judge did not do that. And you're talking about when he said I, he was referring militarily. Correct, Your Honor. To we. Correct, Your Honor. And if I may, I'd like to take the Court through a little bit of that testimony because I think it will illuminate Mr. Rojas' explanation on this issue. So in 2001, Mr. Rojas was asked a confusing question by his attorney. It was, quote, did you yourself taking to prison individuals that you have encounters against? And his response was I tortured people in Ayacucho. Now, that's at the record at 3673. There were no further questions by his attorney on this point to provide context for this statement. And on cross-examination. Well, let's say at that time he was applying for asylum, correct? And adjustment of status. And adjustment of status. Correct, Your Honor. Yes, that's correct. And there were no further questions by his attorney on direct examination to provide context for this. All we know is that on cross-examination, he was asked by the government, how did you torture people? And he listed, he responded by listing various activities, all starting with the word we. We would blindfold the faces of the terrorists. We would beat them. And that's the record at 3682. Now, during his 2001 testimony, Mr. Rojas never confessed to personally torturing anyone. And he was never asked what role he personally played in any of these activities. Now, flash forward 11 years, and in 2012, he's finally given an opportunity to verbally explain his statements in 2001. And he's asked again, what role did you personally play? Did you personally torture anyone? And he testified unequivocally on numerous occasions, and this is throughout the record, that he did not. And that he then explained, as Your Honor mentioned, that when he said, I tortured people in Ayacucho, and I listed these various activities, I was referring to activities I believed that my platoon may have engaged in on one occasion, and also stories and rumors that I had heard as a low-level soldier in the Peruvian military about actions that the Peruvian military had engaged in in that region where the Shining Path was active. Now, in light of the confused testimony in 2001 and the lack of follow-up on these two points, Mr. Rojas's explanation was a plausible one, and the immigration judge was bound to consider it. His one-line explanation, or not even explanation, statement that that was Mr. Rojas's explanation was insufficient. He didn't have to accept it, though, correct? No, he did not have to accept it, but he did have to explain why it was not a plausible explanation. And the Board of Immigration Appeals, in reviewing the immigration judge's decision, erroneously concluded that because the immigration judge mentioned it in one line on page 12, and that's the only citation in the Board of Immigration Appeals decision to that point in the immigration judge's opinion, the Board of Immigration Appeals also erred because they were required to hold the immigration judge to the standard by this court, which is, again, to explain why that is not a plausible explanation for this key issue. Now, I'd like to also briefly turn to the second point that I made earlier, which is the immigration judge's improper reliance on inconsistencies that did not go to the heart of the adjustment of status claim. Now, again, the heart of the issue that was before the immigration judge was whether and to what extent Mr. Rojas had been involved in any acts of torture while he was serving in the Peruvian military, and whether that would be a bar to his admissibility. Again, in a pre-Real ID Act case, the immigration judge was not permitted to rely on any minor inconsistencies or omissions. Those are not an appropriate basis for an adverse credibility finding. And the immigration judge here relied on three minor inconsistencies, or at least perceived inconsistencies, in making that finding that were inappropriate. The three inconsistencies he relied on were, one, Mr. Rojas' military service and whether it was mandatory or not, second, the type of training that he had received in the military, and third, the number of, quote, encounters that he had had with potential terrorists. Now, these do not go to the heart of the issue, which, again, was whether and to what extent he had committed acts of torture. But in addition, the immigration judge, it's clear when you consider these statements in context that he mischaracterized several of these inconsistencies and did not look at the context and improperly concluded that they were inconsistent. And I'd like to take the Court through a couple of examples. I'm familiar with what you've – I think we're familiar with your briefs and whatnot. I read them carefully. But go ahead. I mean, I also have another issue I want to raise with you. Sure. Would you like to raise it now or should I? Let me raise it now. So I'm reading the administrative record and the brief to the Board of – the brief that you filed with the Board of Immigration Appeals. You raised a number of issues, one of which was he was just a low-level – I forget the name, the term that they used. Rubete. Yeah, Rubete, in the military. And his acts, whatever he engaged in, whatever activity, torturous activity he may have engaged in, was under threat or he was coerced, essentially, under the threat that he would be killed if he didn't do this. Now, that argument was raised in your brief before the BIA, not quite exactly like that, but the gist of it was there. When I read your brief here, that argument drops out. Why did you give up on that argument? Your Honor, I can't speak to the reason that that particular issue was not raised on appeal. I do know that in reviewing the immigration judge and the Board of Immigration Appeals determination, a decision was made that the two legal standards in this court, one, that you need to, again, explain why any inconsistency that is pointed out and why the immigration, the applicant's explanation is not a reasonable one, you need to explain that. And second, that you can't consider minor inconsistencies. Those were sort of two glaring errors that were noticeable from both the immigration judge and the Board of Immigration Appeals decision. And that was the reason that it was not raised. Well, I mean, the argument you raised in your brief to the Board of Appeals was that, you know, the torture bar shouldn't even apply to him. That's correct, Your Honor. Even if you assume that he did all this stuff. That's correct, Your Honor. And I think that is still our position. And the reason that the relief we are asking for the board of immigration Wait a minute. You are or are not pursuing that argument here? We are not pursuing that argument on appeal. However, we are asking this court to deem his 2012 testimony credible so that on remand the Board of Immigration Appeals can consider whether the torture bar applies in light of the 2012 testimony. That was not something that the immigration judge or the Board of Immigration Appeals did. All right. So, well, I guess we don't really consider it. That's something that you want to have considered if there's a remand, right, by the BIA or the IJ? Correct, by the BIA or the IJ. That's correct, yes. Well, so let me ask you this. So the IJ here, after you found him not credible, said, well, I'm going to rely on the testimony at the first hearing. Correct. Correct? That's right. So that, and in your brief to the BIA, you raised all this stuff about how the torture bar shouldn't even apply. Yes, Your Honor. Which, I mean, I don't think that issue is not exhausted. It's just that it's not raised in the brief before us. Correct, Your Honor. I mean, again, as I stated, I think that our position, and in the BIA appeal brief, we analyzed whether the torture bar applied in light of his 2012 testimony. And I think that, you know, if this Court were to deem his 2012 testimony credible and remand to the BIA for a determination of that issue, that would be our analysis. I mean, obviously it would be up to the BIA whether or not that was perceived. Because it's not entirely clear that, well, it's an open question under the torture bar whether or not, you know, if you act under coercion, whether the torture bar should apply. Well, correct, Your Honor. I think that, you know, to clarify, I don't think that our position has ever been, and I don't think that the record in 2012 shows that Mr. Rojas ever personally engaged in any acts of torture. Right, I understand that. But you've got the findings from the first hearing. Right, that's correct. However, I think even the findings from the first hearing never go into any degree of detail regarding what role he personally played or what he ever did. It was only in 2012 when he was given an explanation to actually walk through his explanation of his role and what he had done that we first see just how low level he was and the fact that his role was limited to serving his regular guard duty on the rooftop of a barracks in Yeshiva when he believed certain events may have occurred. And that was it. So is your position that the torture bar should – well, if you're stuck with the findings of the first hearing, the first IJ's findings, if that's – let's just assume you're stuck with that. What's your argument that the torture bar doesn't apply? Well, Your Honor, I think that – Is it a factual argument or is it a legal argument? Or both? Well, I think it's both. I think that, you know, as Your Honor noted, there is no Ninth Circuit case law construing the applicability of the torture bar statute. The only published opinion is a Sixth Circuit case, Abdullahi v. Holder, which is a 2012 opinion, in which they essentially determined whether there was a nexus between an individual's actions in the torture that occurred and the scienter. Now, assuming, for purposes of this argument, that we are bound by the 2001 testimony, I don't think that a one-sentence statement, I tortured people in Ayacucho, which again was in response to a question that didn't even ask him whether or not he had committed acts of torture. It was, did you yourself take into prison individuals you had encounters against? That statement combined with a paragraph in which he lists actions that we took is not enough to show any nexus between his actions in torture or a degree of scienter about activities that he was involved with. And I think that, you know, going forward to 2012, it's clear when he is given the opportunity to expound on these statements that his involvement was actually quite limited. But I'd like to turn, since I only have a couple of minutes remaining, to one of the minor inconsistencies that the immigration judge focused on and why it's relevant. The immigration judge focused on Mr. Rojas's mandatory military service and the fact that he appeared to be contradictory on this issue. He's actually been remarkably consistent with the exception of a one-word response he gave in 2001. In his asylum application, he submitted to the court that he was part of the Peruvian military under, quote, obligatory military service. In 2001, he was just asked by his attorney, was your act of joining the military voluntary or, and he interrupted his attorney and just said, voluntarily. And then in 2012, he testified again that his service was mandatory and also submitted documentary evidence to the court stating that unequivocally Peruvian males were required to serve in the military during this time. I think for these reasons, the immigration judge's decision to take these statements out of context and then clearly not consider documentary evidence, as well as the immigration judge's failure to consider his explanation on these issues, we would ask that this court deem his 2012 testimony credible and remand to the BIA. I'd like to reserve my reigning time for rebuttal. That's fine. Thank you. May it please the court. I'm Mark Walters, representing the Attorney General. In 2001, Mr. Rojas said, I tortured people. He did not, when asked on cross-examination, sir, did you torture people in Peru? Say, no, I didn't mean to say that. He said, in the emergency zone. Okay, can you explain how you tortured them? Really? Do you really want to know the details? Yes. And then he went on to explain in gruesome detail how he tortured them. Now, he says, when I said I, I meant we, and also when I said when I meant we, I didn't mean to include me. He's laying it all off on the Peruvian military generally or others in his unit. When he gave that explanation, the immigration judge and later the board did consider it. The immigration judge mentioned a number of things that cut against it. First, he was found credible in 2001, and he never appealed it, and the government never challenged it. Second, he gave the gruesome details. Third, he admitted some involvement in torture in 2007, when he started backtracking from his I tortured people statement. In 2007, he says, well, I didn't torture people, but I was a witness. I heard and observed what was going on while standing guard. They also, both the board and the IJ, noted that his I tortured people statement is consistent with what he put in his asylum application, which was to check the box yes when it asked if he or any member of his family had ever harmed someone. And then finally, his entire application for asylum in 2001 was based on fear of what the Shining Path guerrillas would do to him because of the torture. And if he meant we and not including me, then why did he say when they asked, well, how would they know you were involved in torture, our faces were not covered? Totally inconsistent with his explanation that I does not include me. It means we but not me. As far as the other, we would submit that that alone, I tortured people, that there's almost nothing a reviewing court could do to overturn that because the explanations you give after that are going to be very difficult to make credibly. In this case, it hasn't been done. Yes. Yes. And it was considered. And it was rejected. And substantial evidence supports the decision to reject it. As far as the other so-called minor, and they are more minor, they aren't as central as this. But they are going to the heart of the claim, an asylum claim that says because of my military service in the Marines in Peru, I'm going to be persecuted by the Shining Path when I go back. Well, what was that service? What were the details of it? And when you say I participated in the military voluntarily on one time and then later say it was mandatory, you are distancing yourself. You're trying to distance yourself from responsibility. He was asked to explain that. He said I have no idea. There could have been mandatory. I don't quite understand what the situation in Peru was at the time, but there could have been mandatory service in the military among a certain age group, and a person in that age group could voluntarily join the Marines. Well, that's possible. As opposed to the Navy. He had no explanation. I don't know about you, but in my era, we had the draft, and many of my contemporaries joined up rather than waiting to be drafted. Sure. If you wanted to pick your branch of the service, you didn't wait to be drafted. You volunteered. Yes. That, unfortunately, was not his explanation. Well, no, but I mean there's nothing really. He had no idea why he said it, and that's on pages 406 and 07 when he was asked. As far as the training goes, he initially said he was assigned to a unit that was designed to combat terrorism, and he received intensive training to that end, and then later he denied that. He denied that that's what he was assigned to and denied getting any specialized training, and when asked to explain that, he had no explanation, and that was on the next slide. I'm sorry, I don't have a specific page number for that, but he didn't have an explanation for that one. He said he was in combat constantly, and this goes to the heart of the claim because the more contact you have with the guerrillas, the more they're likely to be able to tell who you were, and the more they may be offended by your actions. He said he was in combat 10 to 50 times, more than 10, less than 50 when asked to estimate. This is combat with the shining path. Later, he denied being in combat ever. He said it was harassment, and it was maybe three times. He doesn't know why he used the word combat in 2001 when asked to explain. When asked, he said it was more than 10, but now says two or three. He says, I really don't know why I said more than 10. That's on page 422. So when you surround the main problem with his I tortured people with these other admittedly lesser things, none of this court's precedent forbids consideration of other less central inconsistencies, especially if you can have it considered cumulatively, which you could here, and if it relates to the central issue in the case. I have one apology I'd like to make to the court and opposing counsel. In the reply brief, they point out that on page 38 of our brief, we overstate the situation by saying that he admitted he tortured people in 2001 and again in 2007. That is incorrect. In 2007, he stood guard while torture was going on. So elsewhere in our brief, we've got it right, but we did want to point that out and offer an apology. I want to see if you could address the issue that I raised on the torture bar. Yes. So I read the record and whatnot, and one of the things that caught me in the testimony that he offered back at the first hearing was he says, at one point, and I don't have the page numbers handy, but he says, okay, now, when you say that, was that under the command of your commander? An order, yes. Okay, now, if you had not obeyed the order, what would have happened to you? I probably punished or blamed that I was cooperating with the terrorist. And what would you think the form of punishment would have been against you? It would have been mainly physical. Do you think you would have been killed or put in prison? Probably yes. Now, then when I read the appellate brief to the Board of Immigration Appeals, they raised, they argued that the torture bar shouldn't apply in these circumstances where he's forced. Well, Your Honor. A low-level military officer to do that. And then that struck my interest because, you know, it's not clear whether or not there's a coercion defense to the torture bar or to the persecutor bar. Well, Your Honor, it might have been. In New Gessie, the Supreme Court left that, didn't answer that question, but instead sent it back to the Second Circuit and back to the Board. They were also talking about a completely different bar. It's different, but they're very analogous. Well, that would be something that, had they raised it, we would certainly want to brief. They raised it before the Board. They just didn't. Right. They exhausted below. They didn't put it into their brief here, but that doesn't mean it's, you know, jurisdictionally barred. Well, it's waived, Your Honor. If it's not briefed, it's waived. They have to both exhaust and waive it. The court can also raise the issue. Well, but, Your Honor, that's a very important issue, a very important issue. Yes. No, it is. And I think what we have here, it's very hard to. The other thing that, you know, your argument that what happened in 2001 when he was seeking asylum probably makes some sense, that he may have embellished his circumstances in order to support his claim for asylum. On the other hand, I thought it was also interesting that the immigration judge at that time said, well, if we didn't have this problem, I'd grant, you know, get relief. Well, what the immigration judge said is what they were doing to the Shining Path, the Shining Path was doing to the Marines, torturing. And he said that's how you have to deal with individuals like this. You can't deal with them lawfully. That statement is completely contrary to law. The fact that Group A tortures does not mean that we have to admit somebody from Group B who tortures back. Well, later on, I'm sorry, I misspoke. But in the second hearing, at the end of the hearing, the IJ says, well, if the torture bar didn't apply, I would grant him adjustment of status. Yes. Well, I read that, Your Honor, and this is speculation, that this case has been going on for a long time. It's been up and down several times. I think the immigration judge was trying to indicate that if this gets overturned for any reason, there's no need to send it back to me that this person is otherwise eligible but for the torture. And so he wouldn't have to do that. He could have just ruled on it. Well, he said more than just that. I mean, he did say some favorable things about, you know, his background and his personality and everything else, his family. But unfortunately, the U.S. policy not to provide safe haven to torturers trumps that. And if I may, Your Honor, the question about whether you should consider the duress argument when it hasn't been made, there is a tactical decision to be made. Are you going to say, no, I didn't torture, and at the same time said, but if I did, I was forced? That's a really hard argument to make on appeal. It makes it even more incredible than maybe we are right now. So I think counsel is stuck with the choice they made. Pick one or the other. Okay, I tortured, but it was under duress. Or in this case, no, I have an explanation. I was misunderstood. And that's the one that's been briefed and presented to the court. Interestingly is that he goes to the second hearing and he tries to explain his prior testimony. And the I.J. says, well, I just don't believe this explanation. But we found you credible the last time, so I'm going to go with the testimony from the first hearing. Yes. That's the credible testimony, and that's what I'm going to rely on, and that's how I'm going to evaluate your claim. And you lose under the torture bar. But there's a serious question about whether or not the torture under these circumstances, whether the torture bar should even apply. Well, it's not presented. It's a legitimate question. It could be a legitimate question if it had been presented, but it hasn't been briefed and it hasn't been presented. And I don't think our statute provides a duress exception. Now, I'd have to, you know, that's not the Department of Justice's position because we haven't been asked to take a position on this. That's just my reading of the statute. On page 104, the immigration judge sets out in detail what the definition of torture is. And there's no exception in there. It's just 18 U.S.C. 2340. Well, the persecutor bar also is similar, very similar, to the torture bar. And in the Supreme Court's decision in New Gassie, the question was whether or not there was an exception for coercion or duress. And the court said, well, you know, it's not entirely. It's ambiguous. And it's a question the board should decide. The Supreme Court. The board never really – the Second Circuit sent it back to the board, and the board never really answered that question. They have not yet answered it. That's correct, Your Honor. And the Supreme Court didn't say it applies. No. The Supreme Court just did not like the reliance on the – I think it's the Displaced Persons Act of post-World War II. Yes, that was it. Yes. That's correct. So it – the decision remains open. And we submit that it's much better to have it considered for the first time in this circuit in a fully briefed case where the petitioner actually pursues it all the way to the court and the government has a chance to respond. Okay. Fair enough. Unless the court has questions, Your Honor. Thank you. Your Honors, if I may, I'd like to address two of the issues that came up in the government's argument. Starting with the government's indication that Mr. Rojas has been repeatedly inconsistent with the court. That's a mischaracterization of his testimony. If anything, over time, Mr. Rojas has grown increasingly more specific. In 2007 and his 2009 declarations, he was not changing his testimony. He was simply giving the specificity required by stating that he stood guard while serving on the rooftops of the barracks in Ayacucho, which is consistent with his 2012 testimony. The government would also have this court rely on the immigration judge's 2001 findings. However, the immigration judge in that case actually found that under those facts, Mr. Rojas was not a persecutor, under the persecutor exception to asylum claims. And again, simply because Mr. Rojas' asylum claim, which he was pursuing in 2001, relates to his military service, does not mean that any fact that relates to his military service goes to the heart of his claim. Making that rule, which is contrary to this court's precedent, would render the heart of the doctrine precedent unusable in this instance. And that is still the law that applies because this is a pre-Real ID Act case. And I'd like to close by noting that Your Honor noted that the immigration judge in 2012 found that Mr. Rojas, were it not for this finding, would be eligible to adjust his status as a matter of discretion. And that's absolutely correct because in relying on a series of factors, including the fact that Mr. Rojas has now been here since the age of 25, he's now 47, he has a wife and two children, all of whom were born and raised in the United States and have never been to Peru, and he is their sole income provider. All of these factors merited adjustment as a matter of discretion. Thank you, Your Honors. Thank you, Counsel. Interesting case. The matter is submitted.
judges: Reinhardt, Tashima, Paez